UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **Jane Doe (HT-00005)**<br><br> **Plaintiff,**<br><br> v.<br><br>**Red Roof Franchising, LLC;**<br>**Choice Hotels International, Inc.;**<br>**Wyndham Hotels & Resorts, Inc.;**<br>**Wyndham Hotel Group, LLC;**<br>**G6 Hospitality, LLC;**<br>**G6 Hospitality Franchising, LLC;**<br>**Studio 6 Delk Road LLC;**<br>**Swami I Hospitality Corp.;**<br>**AAMBA, L.L.C.;**<br>**Aditi Hospitality LLC;**<br>**Anna Hotels LLC**<br>**HMM Hansa, Inc.;**<br>**JayDave, Inc.**<br><br>**DOES 1-10,**<br><br> **Defendants** | **Case No.:**<br><br>**JUDGE:**<br><br>**MAGISTRATE JUDGE:**<br><br><br>**Demand for Jury Trial** |

## COMPLAINT FOR DAMAGES

### INTRODUCTION

1. Plaintiff, Jane Doe HT-00005, files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that occurred from the years 2014 through 2018, when she was 16 through 19 years of age. For years, Plaintiff was subjected to untold atrocities, including rape, verbal and physical attacks, humiliation, fear, and sexual assault at hotels owned, operated, maintained, and controlled by the hotel defendants (and their agents and employees) named in this case.

2. Plaintiff was trafficked in hotels owned, operated and managed by Defendants Red Roof Franchising, LLC; Choice Hotels International, Inc.; Wyndham Hotels & Resorts, Inc.; Wyndham Hotel Group, LLC; G6 Hospitality LLC; G6 Hospitality Franchising, LLC;

1

Studio 6 Delk Road LLC; Swami I Hospitality LLC, Anna Hotels LLC, HMM Hansa Inc., and JayDave Inc. Plaintiff's trafficker rented hotel rooms for the purpose of engaging in sex trafficking.

3. As discussed herein, the defendants derived a financial benefit from widespread use of their hotel properties for sex trafficking, including the trafficking of Plaintiff. Despite obvious and apparent signs of sex trafficking, these defendants continued renting hotel rooms to Plaintiff's traffickers and operated the hotels in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability. Thus, these defendants are civilly liable to Plaintiff pursuant to federal anti-trafficking laws and statutory remedies.

**PARTIES**

4. Plaintiff is a natural person, currently 27 years of age, who is a resident and citizen of New Cumberland, PA.

5. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16). a. Due to the sensitive and intimate nature of the issues, Plaintiff requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[1]

6. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[2] Fed. R. Civ. P. 10(a).

highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[4]

7. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

8. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[5]

9. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

10. Red Roof Franchising, LLC, is the franchising division of parent corporation Red Roof Inns, Inc., which is a publicly traded company. Red Roof Franchising, LLC provides franchising opportunities to brand hotels and motels to local owners across the country and around the world. It was named one of the fastest-growing franchises in 2017. It is a Delaware limited liability company with its corporate headquarters and principal place of

---

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); James v. Jacobson, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

[5] *Does I thru XXII*I, 214 F.3d at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

business located at 7815 Walton Parkway, New Albany, Ohio 43054. Red Roof does business in a systematic and continuous manner throughout Ohio, including this District and Division.

11. Defendant G6 Hospitality, LLC ("G6 Hospitality") is a for-profit limited liability company organized under the laws of the State of Delaware, with its principal place of business in Carrollton, Texas. G6 Hospitality is one of the largest hotel franchisors in the world and owns, operates, franchises, and/or licenses lodging facilities throughout the United States, including under the Motel 6 and Studio 6 brands. G6 Hospitality does business in a systematic and continuous manner throughout Ohio, including within this District and Division.

12. Defendant G6 Hospitality Franchising, LLC ("G6 Franchising") is a Delaware limited liability company with its principal place of business in Carrollton, Texas. G6 Franchising is responsible for franchising, licensing, and exercising control over branded lodging properties, including Motel 6 locations throughout the United States. G6 Franchising does business in a systematic and continuous manner throughout Ohio, including within this District and Division.

13. Defendant Choice Hotels International, Inc. ("Choice") is one of the largest hotel franchising companies in the world with over 7,000 branded properties in more than forty (40) countries and territories. It is a Delaware corporation. Choice does business in a systematic and continuous manner throughout Ohio, including this District and Division.

14. Defendant Wyndham Hotels & Resorts, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It does business in a systematic and continuous manner throughout Ohio, including this District and Division.

15. Defendant Wyndham Hotel Group, LLC is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It does business in a systematic and continuous manner throughout Ohio, including this District and Division.

16. Studio 6 Delk Road LLC, is a Georgia limited liability company. It owned and operated the Motel 6 Marietta located at 2360 Delk Rd, Marietta, GA during the time that the Plaintiff was trafficked.

17. Swami I Hospitality Corp. is a Georgia limited liability company. It owned and operated the Super 8 by Wyndham located at 610 Franklin Gateway SE, Marietta, GA until approximately September of 2018, and during some of the time that Plaintiff was trafficked there.

18. AAMBA L.L.C., is a Georgia limited liability company. It owned and operated the Knights Inn Austell at 1595 Blair Bridge Rd, Austell, GA during the time that the Plaintiff was trafficked.

19. Aditi Hospitality LLC, is a Georgia limited liability company. It owned and operated the Quality Inn Austell, located at 1100 N Blairs Bridge Rd, Austell, GA, until sometime in 2018 and during some of the time that the Plaintiff was trafficked.

20. Anna Hotels LLC, is a Georgia limited liability company. It owned and operated the Quality Inn Austell, located at 1100 N Blairs Bridge Rd, Austell, GA, from 2018 until 2020 and during some of the time that the Plaintiff was trafficked.

21. HMM Hansa Inc., is a Georgia Corporation. It owned and operated the Rodeway Inn, located at 125 South Service Road, Austell, GA during some of the time that the Plaintiff was trafficked.

22. JayDave Inc., is a Georgia Corporation. It owned and operated the Budget Inn located at 1650 Blair Bridge Rd, Austell, GA during the time that the Plaintiff was trafficked.

23. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff does allege that the principals and members of the Andrews-Ashkar defendants are responsible for the acts alleged herein, including under an alter-ego theory. Plaintiff will seek leave to amend this Complaint, as appropriate, to allege the true names and capacities of these fictitiously named Defendants when they are ascertained. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1–10 is responsible for the conduct alleged in this Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.

5

**JURISDICTION AND VENUE**

24. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA and under CAVRA.

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and because the CAVRA cause of action permits this lawsuit to be filed in any suitable United States District Court.

**SEX TRAFFICKING OVERVIEW**

26. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

27. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

28. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

29. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.

30. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by

6

846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

31. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

32. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third-largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

33. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

34. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

35. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of

their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

36. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

37. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

38. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, and exploit internet and social media platforms to recruit victims and market their services. Criminal organizations also engage financial and legal entities to structure and manage their operations. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

39. For decades, sex traffickers have operated openly within hotels and motels throughout the United States. Throughout this period, traffickers conducted their activities on hotel properties while major hospitality corporations failed to take reasonable action to prevent or disrupt trafficking. Instead, many hotels and motels limited their responses to nominal anti-trafficking initiatives while continuing to collect substantial profits from trafficking occurring on their premises.

40. In fact, hotels constitute the primary locations in which sex trafficking takes place. This prevalence is not coincidental. For years, traffickers have exploited hotels as low-risk, high-profit environments. In 2014, 92 percent of reports to the Human Trafficking Hotline

8

involved allegations of sex trafficking occurring in hotels. Moreover, hotels have been found to account for over 90 percent of the commercial sexual exploitation of children.

41. The hotel industry, including Defendants, derives substantial profits from participation in ventures that they knew or should have known were engaged in conduct violating 18 U.S.C. § 1591(a). Such participation includes renting hotel rooms used to harbor sex trafficking victims on a recurring basis and providing internet services that traffickers utilize to advertise and solicit victims for commercial sex acts. This arrangement constitutes a mutually beneficial relationship between Defendants and traffickers, sustained by the sexual exploitation of victims.

42. In light of the established link between hotels and sex trafficking, government agencies and nonprofit organizations, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, various state Attorney Generals, Love 146, EPCAT, among others, have undertaken extensive efforts to educate the hotel industry, regarding best practices for identifying and responding to trafficking. Indicators of sex trafficking in hotel environments are well documented, follow consistent patterns, and are readily detectable by appropriately trained personnel. Comprehensive, hotel-specific toolkits have been developed to enable staff at all levels to recognize and respond to trafficking indicators. Throughout a guest's stay— from check-in to check-out—traffickers and victims display recognizable warning signs.

43. Industry participants have access to substantial publicly available information concerning the prevalence of human trafficking in hotel settings, including industry-focused reports prepared by organizations such as the Polaris Project.

44. Education and training are among the most effective means of preventing and combating sexual exploitation and human trafficking. As ECPAT concluded: "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."

45. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained." In reference to hoteliers, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

46. The well-known and pervasive relationship between sex trafficking and the hotel industry necessarily informs what Defendants knew or should have known about the trafficking of Plaintiff at Defendants' hotel.

47. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

### Plaintiff was Trafficked

48. At the age of 17, Plaintiff was unhoused and pregnant, living with her family in an Atlanta area hotel when she met a man who went by the alias "Ocean."[6]

49. Ocean presented himself as a romantic partner interested in taking care of Plaintiff through her child's birth. Instead, she found herself, 5 months pregnant, being trafficked out of six Atlanta area hotels.

50. Ocean had an established business of trafficking underage women through Backpage.com in budget hotels in the Atlanta area. These advertisements soon included photographs of Plaintiff. During that period, Plaintiff had her identification confiscated, her movements were tracked, and access to a phone and young child was weaponized. He kept her compliant primarily through psychological manipulation, framing her sexual exploitation is "acts of love" towards him.

---

[6] To protect Plaintiff's identity, she will disclose her identity and that of her trafficker once the Court enters a True Identity Protective Order.

51. Plaintiff was trafficked for approximately the next three years out of the following hotels:

- Quality Inn & Suites, Austell at 1100 N Blairs Bridge Rd, Austell, GA (franchisor: Choice);

- Knights Inn, Austell at 1595 Blair Bridge Rd, Austell, GA (franchisor: Wyndham until 2018 and Red Lions Hotel thereafter);

- Rodeway Inn, Austell at 125 South Service Road, Austell, GA (franchisor: Choice);

- Budget Inn, Austell at 1595 Blair Bridge Rd, Austell, GA;

- Motel 6 Marietta at 2360 Delk Rd, Marietta, GA (franchisor: G6);

- Super 8 by Wyndham at 610 Franklin Gateway SE, Marietta, GA (franchisor: Wyndham).

52. At each of these locations, there were overt and obvious signs of Plaintiff's trafficking, including the constant foot traffic of adult men coming and going, Plaintiff propping open doors (because she rarely had a room key), requesting access to rooms without identification, regular contact with house cleaning staff, discussions related to the business being operated out of the hotels.

53. Plaintiff exhibited clear indicators of trafficking in her interactions with her traffickers, hotel staff, and others, including a nervous and fearful demeanor; signs of paranoia and disorientation; refusal to make eye contact;; inability to move freely throughout the hotel or communicate independently; and submissive behavior, including seeking permission from her trafficker for basic needs and allowing traffickers to speak on her behalf.

54. These indicators matched well-recognized "red flags" of human trafficking in the hotel industry and were known to each Defendant to be signs of sex trafficking in a hotel environment.

55. Over time, the conditions escalated. After years of control and abuse, Plaintiff was able to escape the hold of Ocean, and thereafter participation in his criminal prosecution following a violent encounter that left her in the emergency room.

56. As a direct result of being exploited as a minor and young adult, Plaintiff experienced homelessness and prostitution related convictions. Plaintiff suffered significant and lasting

psychological, emotional, and relational harm. The long-term effects of her exploitation continue to impact her in profound and ongoing ways.

**Sex Trafficking at Red Roof Inns**

57. Red Roof's actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Plaintiff's trafficking, that sex trafficking was ongoing and widespread at Red Roof properties.

58. For years, Red Roof has demonstrated willful blindness to the rampant culture of sex trafficking, which tragically occurs on its Red Roof Inn branded properties throughout the country. This same entrenched, pervasive willful blindness to sex trafficking facilitated the sex trafficking of Plaintiff that forms the basis of this complaint.

59. In April of 2017, a man, two women, and four minors were trafficked out of a Red Roof Inn in St. Charles, Missouri. The women and girls were forced to post ads for sex on websites and were not given any money for their work.[7]

60. In August of 2016, two individuals trafficked many Asian women out of a Red Roof Inn in Princeton, New Jersey. These women were advertised by their traffickers on various websites and forced into sexual acts without receiving monetary payment.[8]

61. In August of 2016, the United States Government reached $175,000 settlement with former owners of Charlotte, North Carolina Red Roof Inn as penalty for sex trafficking and drug crimes on hotel property.[9]

---

[7] Ohio Man Sentenced on Sex Trafficking Charges, THE UNITED STATES DEPARTMENT OF JUSTICE (Nov.7,2019) https://www.justice.gov/usao-edmo/pr/ohio-man-sentenced-sex-trafficking-charges.

[8] Cameron Luttrell, Three People Arrested for Human Trafficking in Mercer County: Police, PATCH (Nov.7,2019) https://patch.com/new-jersey/princeton/three-people-arrested-human-trafficking-mercer-county-police

[9] Cara Field, Former Owners of Motel Used For Child Sex- Trafficking to forfeit $175K,WYFF,(Nov.7,2019) https://www.wyff4.com/article/former-owners-of-motel-used-for-child-sex-trafficking-to-forfeit-175k/7023625

62. In November of 2014, a man locked a woman in his home then brought her to a Red Roof Inn in Louisville, Kentucky where she was forced to engage in prostitution.[10]

63. In November of 2016, a man wrote love letters in order to entice a 15-year-old girl into prostitution. He placed advertisements for her on the internet and bought room at a Red Roof Inn in Windsor Locks, Connecticut where she was forced to prostitute herself.[11]

64. In May of 2017, Twenty- three individuals were arrested in San Joaquin County, California in a human trafficking investigation. Police discovered eight girls, ages 14 to 17, who were forced to prostitute at a Red Roof Inn.[12]

65. In January of 2018, a woman rented rooms from the Red Roof Inn in Saint Charles, Missouri in order to traffic a 17-year-old girl.[13]

66. In December of 2016, four individuals were arrested for human trafficking at Red Roof Inn in Blue Ash, Ohio. One of the individuals lived across the street allowing him to run the trafficking ring from his residence.[14]

67. In the spring of 2014, two men were arrested for human trafficking, kidnapping, deriving support from alleged "prostitution" and rape at the Red Roof Inn in Saugus, Massachusetts.[15]

---

[10] Nathan Vicar, Avondale Man Pleads Guilty to Sex Trafficking in Louisville, FOX 19, (Nov7,2019) https://www.fox19.com/story/27390036/avondale-man-pleads-guilty-to-sex-trafficking-in-louisville/

[11] Deputies: Lauderhill Man Arrested on Charges of Human Trafficking in Tampa, AAKASH ENTERPRISE TIMES (Nov.7,2019), http://www.courant.com/news/connecticut/hc-sex-trafficking-teenager-prison-1115-20161114-story.html

[12] Sarah Heise, 23 Arrested for Human Trafficking, Prostitution in San Joaquin County, KRCA,(Nov.8,2019), https://www.kcra.com/article/23-arrested-in-san-joaquin-county-human-trafficking/9588063

[13] Erica Tallan, Woman Accused of Child Sex Trafficking at St. Charles Motel, FOX 2, (Nov.8,2019) https://fox2now.com/2018/01/29/woman-accused-of-child-sex-trafficking-at-st-charles-motel/ 34Dan Griffin, 4 Indicted in Human- Trafficking Case at Blue Ash Hotel, WLWT (Nov.7,2019).

[14] Dan Griffin, 4 Indicted in Human- Trafficking Case at Blue Ash Hotel, WLWT (Nov.7,2019).,https://www.wlwt.com/article/4- people-indicted-in-human-trafficking-case-at-blue-ash-hotel/8547287

[15] Julie Manganis, Woman Says Lured With Promise of Heroin, Forced to Work as Prostitute, SALEMN NEWS, (Nov.8,2019) https://www.salemnews.com/news/local_news/woman-says-lured-with-promise-of-heroin-forced-towork/article_018e29b6-d6e1- 5b7e-b3ff-c42171fa611c.html

13

68. In November 2014, a man was arrested and later sentenced to prison for sex trafficking a 15-year-old girl at the Red Roof Inn in Enfield, Connecticut.[16]

69. In 2015, the Red Roof Inn located in Charlotte, North Carolina, was seized for profiting from sex trafficking that occurred on the property. The sex trafficking had been occurring for years, and Red Roof Inn managers and maids were paid by pimps to not report the activities.[17]

70. In October of 2015, a man trafficked women whom he controlled with drugs for commercial sex at the Red Roof Inn in Plains Township, Pennsylvania as well as other hotel chains.[18]

**Sex Trafficking at Choice Hotels**

71. For years, Defendant Choice has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking, which tragically occurs on its hotel properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff at the Rodeway Inn and Quality Inn hotel brands that form the basis of this complaint. For example:

72. On November 10, 2009, a young child was raped and killed at a Comfort Inn, which is a Choice-branded hotel, in Fayetteville, North Carolina.[19] The incident caused such outrage that child advocates petitioned Defendant Choice to take steps to prevent sex trafficking in

---

[16] David Owens, Hartford Man Sentenced to Prison For Sex Trafficking of 15-Year-Old Girl HARTFORD COURANT, (Nov.8,2019), https://www.courant.com/news/connecticut/hc-sex-trafficking-teenager-prison-1115-20161114- story.html

[17] Charlotte Hotel at Center of Sex Trafficking Allegations, WCNC (Nov.8,2019) https://www.wcnc.com/article/news/crime/charlotte-hotel-at-center-of-sex-trafficking-allegations/213056842

[18] oseph Kohut, Scranton Sex Trafficking Cases Move Forward, POCONO FORWARD (Nov.7,2019), https://www.poconorecord.com/news/20161204/scranton-sex-trafficking-cases-move-forward

[19] WRAL.com, *Shaniya Davis Was Raped, Killed On Same Day* (Nov. 20, 2009), http://www.wral.com/news/local/story/6464217/ (Warrants: Girl abducted, raped, killed on same day.)

its hotels.[20] It was only after this horrific incident that Defendant Choice started to publicize a need for change.

73. In December of 2009, authorities found a man was attempting to use a Comfort Suites in Orlando, Florida, to sex traffic a 15-year-old girl. He was arrested when the 15-year-old girl ran into a store to contact authorities.[21]

74. In November 2010, Defendant Choice partnered with ECPAT-USA to develop a training module to educate its management and staff in the prevention of sex trafficking.[22] However, Defendant Choice did not enforce the program, or require its employees to complete this training, or even follow up to make sure the hotels were following the protocols.[23]

75. In May of 2012, two men were charged with promoting prostitution and engaging in prostitution inside of a Comfort Suites hotel room in Asbury Park, New Jersey.[24]

76. In 2012, an anti-trafficking coalition alerted Defendant Choice of the likelihood of sex trafficking during the London Olympics, and inquired about the company's anti-trafficking policies, while urging immediate action regarding trafficking.[25]

77. Additionally, Defendant Choice has been aware of sex trafficking and guest safety issues at its branded properties through publicly available websites such as www.tripadvisor.com, www.expedia.com, and www.booking.com. Online reviews show the pervasiveness of customer-reported sex trafficking and guest safety issues on Choice-branded properties and Defendant Choice's inattentiveness, for example

---

[20] *See* Change.org Petition, *Tell Choice Hotels To Prevent Child Prostitution In Their Hotels*, available at https://www.change.org/search?q=tell+choice+hotels+to+prevent+child+prostitution+in+their+hotels (last visited Mar. 4, 2019).

[21] *Cops: Man Tried to Sell Girl, 15, for Sex,* The Orlando Sentinel, Dec. 23, 2009.

[22] *See* Choice Hotels*, Human Rights Policy*, available at https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Mar. 4, 2019); *see also* ECPAT-USA, *Tourism Protection Code of Conduct*, available at http://www.ecpatusa.org/code/ (last visited Mar. 4, 2019).

[23] *See* Choice Hotels, *Human Rights Policy, supra,* n.30.

[24] 2 Men Charged with Prostitution, Asbury Park Press, May 19, 2012, at pg B3.

[25] *See* Christian Brothers Investment Services, London Olympics Report Release, *available at* https://cbisonline.com/us/london-olympics-report-release/.

78. In April of 2011, a female escort was choked and robbed by three men in a Choice branded Quality Inn hotel room in Plantation, Florida.[26]

79. In February of 2012, a 14-year-old girl was found at a Choice branded Quality Inn in Oakland, Pennsylvania after missing for a year when authorities set up a sting operation into internet advertisement.[27]

80. In March of 2012, two men were arrested for sex trafficking two minors at a Choice branded Quality Inn hotel in Houston, Texas.[28]

81. In November 2012, two women and one man were arrested at a Choice branded Quality Inn in Boca Raton, Florida after authorities were seeking to crack down on human trafficking.[29]

82. In November of 2012, a reviewer described a Choice branded Quality Inn in Jacksonville, Florida as follows: "As we pull up we have a perfect first impression of one of the local working " girls heading out to make a buck off a tractor trailer driver. The room had dirty towels on the floor in the corner but the staff was great."[30]

**Sex Trafficking at Wyndham properties**

83. The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual

---

[26] *Escorts Target of Spree*, The Miami Herald, Jun. 06, 2011, at pg 20.

[27] *Missing Teen Found During Prostitution Bust*, Pittsburgh Post-Gazette, Feb. 12,2012, at pg 12.

[28] *Two Men Accused of Child Sex Violations Await Trials*, The Odessa American, Apr. 14, 2012, at pg A1 and A4.

[29] *Police Arrest 16 in Prostitution Sting*, The Palm Beach Post, Nov. 23, 2012, at pg B010.

[30] Review of Comfort Suites  Orange Park Jacksonville, *available at* https://www.orbitz.com/Jacksonville-Hotels-Quality-Inn-Orange-Park-Jacksonville.h10686.Hotel-Information

exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[31]

84. In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[32]

85. Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Defendants' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, Wyndham monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels, including:

86. In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Wyndham property hotel in California.[33]

87. In 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Wyndham property hotel Motel in Virginia.[34]

88. In 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Wyndam property hotel.[35]

---

[31] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/_tScott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself."')

[32] https://endsexualexploitation.org/wyndham/

[33] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/.

[34] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa53 7e8/?context= 1530671.

[35] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm.

89. In 2011, an MS-13 gang member was indicted for trafficking girls at a Wyndham property hotel Motel near Washington, D.C.[36]

90. In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Wyndham property hotel.[37]

91. In 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Wyndham property hotel Motel in Oklahoma.[38]

92. In 2013, two were arrested for trafficking a juvenile girl at an Illinois Wyndham property hotel.[39]

93. In 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Wyndham property Motel.[40]

94. A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Wyndham property hotel Motel.[41]

95. In 2013, a man was arrested at a Wyndham property hotel in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[42]

96. In 2013, a Wyndham property hotel motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[43]

---

[36] https://www.thepublicdiscourse.com/2011/10/4034/

[37] https://www.lOtv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklincounty/
530-36f713e6-5488-4465-90cO-7 eb99504a635

[38] Man faces new sex-trafficking charges, Tulsa World (Oklahoma) (March 9, 2013)
https://plus.lexis.com/api/permalink/a9062ala-76b4-4811-89ab-5b0b3c877a88/?context=1530671

[39] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-atmotel/article 98edfl d4-d23 l-5eal-a6b9-e71 c83f44750.html

[40] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle

[41] https://www.ice.gov/news/releases/ dallas-gang-member-sentenced-21-years-federal-prison-child-sex-traffickingconviction

[42] https://turn to 1 0.com/archive/new-details-in-ardrey-sex-trafficing-investigation

[43] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sextraffic:ing-in-mass-teens-disappearance-ece/35397014007

97. In 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Wyndham property motel in Texas.[44]

98. In 2014, a sex trafficking task force arrested four in a Portland area sweep of a Wyndham property hotel.[45]

99. In 2014, two were charged with trafficking a 13-year-old girl at a Minnesota hotel under the Wyndam brand.[46]

100. In 2014, a man was charged in connection with a Lansing, MI based sex trafficking ring involving four 15- to 18-year-old girls who would meet customers at the Super 8 in Lansing.[47]

101. In 2015, a Texas man was arrested and charged with human trafficking and second-degree kidnapping after a woman said she was forced to perform sexual acts and was being held against her will at a Baton Rouge Wyndham property hotel.[48]

102. Reviews of Wyndham branded properties, which upon information and belief the Wyndham Defendants monitored regularly, also show both the pervasiveness of sex trafficking at their branded properties and the Wyndham Defendants' knowledge of same. For example:

103. An August 2008 review of a Wyndham branded property in Arizona states: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[49]

---

[44] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php
[45] https://www.centralmaine.com/2014/03/03/sex _ trafficking_ task_ force_ arrests_ 4 in _portland _ area _prostitution _sting/
[46] https:/ /www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old
[47] https://www.lansingstatejournal.com/story/news/local/2014/11/20/witnesses-face-lansing-man-charged-sextrafficking-ring/70010754/
[48] https://www.watb.com/story/29240032/texas-man-charged-with-human-trafficking-kidnapping-in-baton-rouge/
[49] https://www.tripadvisor.co/Hotel _ Review-g60950-d7 4409-Reviews-Super _ 8 _by_ Wyndham_ Tucson_ Downtown_ Convention_ Center-Tucson_ Arizona.html

104. A January 2010 review of a Wyndham branded property in Escondido, California states: "This is a hooker hangout, doors slamming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM, Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[50]

105. A February 2010 review of a Wyndham branded property in Los Angeles, California states: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile ... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines ... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[51]

106. A June 2010 review of a Wyndham branded property in Virginia states: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel. "[52]

107. A July 2010 review of a Wyndham branded property in Texas states: "After a night out parking lot full had to park under drive-thru in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder roads in front of Motel. All hours of the day."[53]

---

[50] https://www.tripadvisor.com/Hote1_Review-g32358-d235407-i132418454-Super_8_EscondidoEscondido California.html

[51] https://www.tripadvisor.com/Hotel_ Review-g32655-d235134-ReviewsSuper _8 by_ Wyndham_ Hollywood_ La_ Area-Los_ Angeles_ California.html

[52] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-Norfolk:Chesapeake-Bay.h7202.Hotel-Reviews

[53] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-Reviews-Super _ 8 by_ Wyndham_ Austin_ North_ University_ Area-Austin_ Texas.html

108.    An October 2011 review of a Wyndham branded property in Tennessee states: "Don't stay here unless you want drugs or a prostitute .... or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[54]

109.    A February 2012 review of a Wyndham branded property in Florida states: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE! !"[55]

110.    An April 2012 review of a Wyndham branded property in Virginia states: "Just beware, there are "escorts" who are constantly on the lookout for fresh meet. A pimp will knock on your door asking to use your cell to call his girlfriend. From then on, she will do the work."[56]

111.    An April 2012 review of a Wyndham branded property in Texas states: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[57]

112.    An October 2012 review of a Wyndham branded property in Florida states: "the last time i stayed at this super 8, a hooker approached me in the parking lot and informed you . this time there was a drug dealer in the next door room, cars coming and going all

---

[54] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super _ 8 by_ Wyndham_ Knoxville_ Downtown_ Area-Knoxville_ Tennessee.html

[55] https://www.tripadvisor.com/Hotel_ Review-g34378-dl 13362-Reviews-Super _ 8 by_ Wyndham_ Lantana_ West_Palm _ Beach-Lantana _Florida.html

[56] https://www.expedia.com/Manassas-Hotels-Super-8-By-Wyndham-Manassas.h12141.Hotel-Reviews

[57] https://www.tripadvisor.ca/Hotel Review-g56003-d240483-ReviewsSuper _ 8 _by_ Wyndham_ Houston_ Brook.hollow_ NW-Houston_ Texas.html

day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[58]

113.     A March 2013 review of a Wyndham branded property in Louisiana states: "There was a PROSTITUTE running her business from a room, with her pimp standing outside. She propositioned a co-worker as he was going to his room. Then in the middle of the night she and her clients were fighting very loudly over money and services issued!"[59]

114.     A March 2013 review of a Wyndham branded property in Ohio states: "I've been solicited for drugs and by prostitutes here on several occasions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms."[60]

115.     A February 2013 review of a Wyndham branded  property in Minnesota states: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[61]

116.     An April 2013 review of a Wyndham branded property in Georgia states: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[62]

---

[58] https://www.tripadvisor.com/Hotel_ Review-g34378-dl 13362-ReviewsSuper _ 8 _by_ Wyndham_ Lantana_ West_Palm _ Beach-Lantana _Florida.html

[59] https://www.tripadvisor.ca/Hotel Review-g403 1 4-d 120851-Reviews-FairBridge _Inn_ Express_ MetairieMetairie Louisiana.html

[60] https://www.tripadvisor.com/Hotel_ Review-g50891-d226034-Reviews-Quality _Inn_ Colwnbus EastReynoldsburg_Ohio.html

[61] https://www.tripadvisor.com/Hotel_ Review-g43493-d247863-Reviews-Super _ 8 _by_ Wyndham_ St_ CloudSaint Cloud Minnesota.html

[62] https://~.tripadvisor.com/Hotel_ Review-g34856-d217054-Reviews-Super _ 8 _by_ Wyndham_ Atlanta_ Hartsfield _Jackson_ Airport-College park_ Georgia.html

22

117.    A July 2013 review of a Wyndham branded property in California states: "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to tum tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children. Or anyone for that fact.[63]

118.    These articles and reviews are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham hotels.

119.    Moreover, on information and belief, Defendants are aware of additional significant law enforcement activity related to trafficking at their hotels that was not reported in the media.

120.    These articles, news stories, guest surveys, and online reviews show that the use of Wyndham hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of Wyndham hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

121.    Defendants knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Wyndham branded hotels, including the Subject La Quinta, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Subject La Quinta frequently and long before and after the trafficking of the Plaintiff.

**Sex Trafficking at G6 Hotels**

122.    G6's actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Plaintiff's trafficking that sex trafficking was ongoing and widespread at G6 properties.

---

[63] https://www.tripadvisor.com/Hotel_ Review-g32655-d252254-Reviews-or50-Super _ 8 _by_ Wyndham_ Canoga _park-Los_ Angeles_ California.html

23

123.      Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[64]

124.      Public statements of G6 confirm that they knew that sex trafficking is a problem and that they retained control over the response of their branded hotels to this problem. The G6 Defendants recognize that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[65] They also acknowledged the significant role G6 has in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels."[66]

125.      Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. G6 monitored news stories and online reviews for indicia of criminal activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at G6 hotels:

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[67]
- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[68]

---

[64] Sarah Meo and Louise Shelley, *Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility* (Nov. 11, 2021), https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility

[65] *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

[66] *Id.*

[67] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.

[68] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

24

- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[69]

- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[70]

- In January 2012, a couple was charged with prostitution and pimping at a Studio 6 in Roswell, GA[71]

- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[72]

- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama[73]

- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California[74]

---

[69] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[70] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download

[71] Couple arrested for pimping, prostitution, Appen Media (Jan. 17, 2012), https://www.appenmedia.com/public_safety/couple-arrested-for-pimping-prostitution/article_473fe798-1b3d-5c6f-b230-547e3e5c4651.html

[72] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims

[73] FBI Investigates Human Trafficking At Madison Hotel, WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[74] Suspects Busted in Anaheim Sex Ring, ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

25

- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine[75]

- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland[76]

- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women[77]

- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota[78]

- In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity[79]

- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida[80]

- A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City,

[75] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity

[76] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[77] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

[78] Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/

[79] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel, KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.

[80] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

Nevada[81]

- In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island[82]

- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington[83]

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape[84]

126.    These articles represent only a limited and non-exhaustive sample. Numerous additional reports document sex trafficking and related criminal activity at G6-branded hotels. Moreover, upon information and belief, the G6 Defendants are aware of substantial additional law enforcement activity involving trafficking at their properties that was not reported in the media. In total, state and federal law enforcement agencies have prosecuted several hundred traffickers, involving hundreds of victims, for sex trafficking and forced prostitution conducted at G6-branded properties.

127.    News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Jane Doe (IES) was trafficked at the Fenton Motel 6, G6 knew or should have known:

---

[81]Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-22city/21922915/.

[82] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

[83] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/. https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[84] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danvers-Danvers_Massachusetts.html

a. The use of G6 branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b. Commercial sex work occurring at G6 branded properties involved trafficking and compelled prostitution;

c. G6 franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at G6 hotel properties;

d. Their efforts, if any, to stop facilitating sex trafficking in G6 branded properties were not effective; and

e. They were, by their acts and omissions, facilitating sex trafficking at G6 branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

128. Despite the continually mounting evidence that sex trafficking at G6 branded properties was ongoing and growing, G6 did not change course. G6 chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking

**Actual and Constructive Knowledge**

129. At all relevant times, the defendants knew or should have known that sex trafficking was prevalent at their hotels because the trafficking occurred openly on these premises, followed well-established patterns, and presented with obvious indicators that Defendants recognized and acknowledged as signs of sex trafficking in a hotel environment.

130. Upon information and belief, Plaintiff's trafficker, along with other traffickers, repeatedly selected these locations to conduct sex trafficking activities because their policies and practices created a favorable environment for trafficking and because hotel staff routinely ignored or failed to act on clear indicators of trafficking. As a result, traffickers were able to operate with minimal effort to conceal their activities, based on an implicit understanding that their conduct would not be questioned or disrupted by the hotels.

131. Moreover, numerous trafficking "red flags" were observed by hotel staff and management at both locations. These indicators included, among others, payment in cash

28

or prepaid cards; unusually high volumes of men, who were not registered guests, entering and exiting rooms at all hours; extended stays despite arriving with few personal possessions; and other conduct consistent with the well-established indicators of sex trafficking described above.

132. During the period that Plaintiff was trafficked at each of these hotel properties, there were obvious signs that her trafficker was engaged in sex trafficking:

- Plaintiff's trafficker or a "buyer" would pay for the room with cash or prepaid credit cards.
- Plaintiff would appear to be with a significantly older "boyfriend" and have lower quality clothing compared to the males she was with.
- At check-in, the hotel staff observed Plaintiff exhibit evidence of being verbally threatened and emotional abuse.
- Plaintiff's trafficker would reserve multiple rooms.
- Plaintiff would have few or no personal items when checking in.
- Plaintiff would often be dropped off at the hotel by her trafficker.
- Plaintiff could be seen loitering on the property and appearing to monitor the area.
- Plaintiff had heavy foot traffic of non-hotel guests and older males coming from the room she was trafficked in.
- The "Do Not Disturb" door hanger was used very frequently.
- After Plaintiff checked out, the hotel cleaning staff noticed large amounts of sex paraphernalia, like condoms and lubricant, in the trash.
- Plaintiff prevented housekeeping staff from entering the room for regular cleaning.

133. Other obvious signs of trafficking consistent with the modus operandi of her trafficker, which included well-known "red flags" for trafficking in a hotel.

134. Employees at these hotels, including management-level employees, observed or were made aware of these obvious signs of Plaintiff's trafficking while acting within the scope and course of their employment.

135. As such, the defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at the subject hotels.

29

136. Given these obvious signs, defendants knew or should have known about the trafficking activity that resulted in the trafficking of Plaintiff.

137. The defendants also knew or should have known about the trafficking of Plaintiff based on the numerous tools through which they monitored and supervised the subject hotels.

138. If the defendants had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Plaintiff's traffickers at the subject properties.

139. The hotel staff and the franchisees also facilitated widespread trafficking at the properties, including the trafficking of Plaintiff in ways including, on information and belief:

140. developing a relationship with Plaintiff's trafficker, and creating an understanding that she could operate at the hotel without risk of interference;

141. continuing to provide rooms, services, and assistance to the trafficker in the face of obvious "red flags" of trafficking of Plaintiff and other victims;

142. accommodating specific requests made by traffickers;

143. serving as lookouts for traffickers;

144. accepting bribes from the trafficker;

145. observing Plaintiff in obvious distress but continuing to provide support to her trafficker;

146. allowing "buyers" who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

147. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

148. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

149. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their

30

activities, but, instead, could operate without concern for detection or interference by the hotel staff;

150.     providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff

151.     The defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Plaintiff.

152.     The defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**Red Roof Inn Franchisor and Franchisee Relationship**

153.     Upon information and belief, it is a standard practice in the hospitality industry, followed by Red Roof Inn for franchising divisions of parent hotel corporations, to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

154.     Red Roof provides their properties, including the Knights Inn Austell location, with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

155.     Defendant Red Roof provides their branded properties, including the Knights Inn Austell location, brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a substantial extent controlled by Defendants.

156. Upon information and belief, Defendant Red Roof requires its branded hotel properties, to use a property management system, which is linked to Red Roof's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions. Defendant Red Roof knew from the data that was kept and monitored from the property management systems that the reservations and credit card transactions monetized sex trafficking at its branded locations, including the one at which Plaintiff here was trafficked, and despite this knowledge Red Roof explicitly agreed with its franchisee to process the financial transactions from which defendants profited from the venture that violated the TVPRA.

157. Upon information and belief, per the relevant franchise agreement, Defendant Red Roof may enforce its brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

158. Upon information and belief, Defendant Red Roof controls the operations of its branded properties, including the property in this lawsuit, through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

   a. providing the software, hardware, and platforms where data and information is shared with Red Roof corporate headquarters;

   b. providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

   c. providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

   d. providing and controlling customer review and response platforms;

   e. hosting online bookings on Red Roof's corporate domain;

   f. requiring branded hotels to use Defendant Red Roof's customer rewards program;

   g. requiring branded hotels to use Defendant Red Roof's property management software;

   h. requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

  i. providing IT support for all property management systems, owned, operated, and required by Red Roof.

  j. setting employee wages;

  k. sharing profits;

  l. standardizing training methods for employees

  m. building and maintaining the facility in a manner specified by the owner;

  n. standardized or strict rules of operation;

  o. regular inspection of the facility and operation by the owner; and

  p. fixing prices

159. Upon information and belief, Defendant Red Roof uses a centralized reservation system, and states in its privacy policy that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests

160. Upon information and belief, Defendant Red Roof requires its hotels to use a consolidated IT system and database for property management, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.

161. Upon information and belief, Defendant Red Roof requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Red Roof the ability to access and harvest that internet data.

162. Defendant Red Roof posts job openings for its branded properties, including the property in this lawsuit, on its central career posting website.

163. Defendant Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.

164. Upon information and belief, Defendant Red Roof requires their brand hotels, including the property in this lawsuit, to pay approximately 10% of gross revenue back to Red Roof for the privilege of using its brand names and following their brand standards

33

165. Defendant Red Roof exhibits a significant degree of interrelated, intermingled, and unified operations at the location at which Plaintiff was trafficked, as to show an agency relationship between Defendants Red Roof and AAMBA.

166. Under federal labor regulations, Red Roof and AAMBA are each considered joint employers of the employees at the location where Plaintiff was trafficked. It is further a standard practice in the hospitality industry, upon information and belief, followed by the Defendants for parent companies to exercise significant control over the employment decisions of their brand hotels.

167. Upon information and belief, Red Roof promulgates policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which Plaintiff was trafficked.

**Choice Hotels Franchisor and Franchisee Relationship**

168. Choice was in a franchise and agency relationship with Defendants Anna Hotels and Aditi Hospitality at the Quality Inn Austell location and with Defendant HHM Hansa at the Rodeway Inn location, offering public lodging services in those hotels. This agency relationship was established through Defendant Choice's exercise of an ongoing and systemic right of control over the Rodeway Inn and Quality Inn hotels by Defendant Choice's operations, including the means and methods of how Rodeway Inn and Quality Inns conducted daily business through one or more of the following actions:

169. providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with Choice;

170. providing reservation platforms where payment modes, guest names, travel habits, or history, and suspicious reservations would suggest trafficking;

171. providing new hire orientation on human rights and corporate responsibility;

172. providing training and education to Rodeway Inn and Quality Inn branded hotels through webinars, seminars, conferences, and online portals;

173. providing and controlling customer review and response platforms;

174. hosting online bookings on Defendant Choice's domain;

175. requiring Rodeway Inn and Quality Inn branded hotels to use Defendant Choice's customer rewards program;

176. requiring Rodeway Inn and Quality Inn branded hotels to use Defendant Choice's property management software;

177. requiring Rodeway Inn and Quality Inn branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

178. providing IT support for all property management systems, owned, operated, and required by Choice;

179. setting employee wages;

180. making employment decisions;

181. advertising for employment;

182. sharing profits;

183. requiring Rodeway Inn and Quality Inn  branded hotels to use Defendant Choice's property management software;

184. requiring Rodeway Inn and Quality Inn branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

185. providing IT support for all property management systems, owned, operated and required by Choice;

186. standardized training methods for employees;

187. building and maintaining the facility in a manner specified by the owner;

188. standardized or strict rules of operation;

189. regular inspection of the facility and operation by owner;

190. fixing prices; or

191. other actions that deprive Rodeway Inn and Quality Inn branded hotels of independence in business operations

192. An apparent agency also exists between Defendant Choice and Rodeway Inn and Quality Inn hotels. Defendant Choice held out the owners of the Rodeway Inn and Quality

Inn branded hotels to the public as possessing the authority to act on its behalf. Defendant Choice clothed them with apparent authority to act for Defendant Choice in the following ways: by requiring the use of Choice signs, providing Choice branded stationery, requiring the use of Choice's website, and Choice's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Choice guest rewards programs. On information and belief, Defendant Choice's conduct reasonably led Plaintiff's trafficker to believe that the Rodeway Inn and Quality Inn hotel had the authority it purported to have, and Plaintiff was injured as a result.

193. As the principal and as a hotel operator, Choice controls the training, policies, and decisions on implementation and execution of policy for its branded properties, including the Rodeway Inn and Quality Inn hotel where Plaintiff was trafficked.

194. Rodeway Inn and Quality Inn hotel's website is hosted at Choice's domain www.choicehotels.com.

195. When staying at Choice branded hotels, guests receive Choice Privileges (Choice rewards) for bookings.

196. Defendant Choice exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Rodeway Inn and Quality Inn hotel where Plaintiff was trafficked for sex.

197. Defendant Choice exercises day-to-day control over the Rodeway Inn and Quality Inn hotel, as well its lax policies and procedures with respect to the prevention of sex trafficking on its hotel properties, including the Rodeway Inn and Quality Inn hotel, through its brand standards and retains control over the Rodeway Inn and Quality Inn hotel through its corporate structure, including its franchise agreements, brand standards, licensing agreements, and operating agreements.

198. Choice makes decisions that directly impact the operations and maintenance of their branded hotels, including the Rodeway Inn and Quality Inn hotel.

199. Choice is the principal in an agency relationship with the owners of the Rodeway Inn and Quality Inn hotel. In addition to Choice's liability under TVPRA section 1595,

Choice is vicariously liable for the acts and/or omissions of the staff at its Rodeway Inn and Quality Inn hotel.

200. In addition to an actual agency relationship. Defendant Choice has ratified the actions and inactions of Defendants Anna Hotels, Aditi Hospitality and HMM Hansa.

201. Defendant Choice and Anna Hotels, Aditi Hospitality and HMM Hansa are single and joint employers with a high degree of interrelated, intermingled, and unified operations at the Rodeway Inn and Quality Inn hotel where the Plaintiff was trafficked for sex. Defendant Choice and Anna Hotels, Aditi Hospitality and HMM Hansa each share the common policies and practices complained of herein.

202. Defendant Choice and Anna Hotels, Aditi Hospitality and HMM Hansa jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

203. As an integrated enterprise and/or joint employer, Defendant Choice and Defendant Anna Hotels, Aditi Hospitality and HMM Hansa are separately and jointly responsible for compliance with all applicable laws.

204. As an integrated enterprise and/or joint employer, Defendant Choice and Defendant Anna Hotels, Aditi Hospitality and HMM Hansa are jointly and severally liable for any damage caused by their employees.

205. Defendant Choice and Defendant Anna Hotels, Aditi Hospitality and HMM Hansa are considered employers under federal labor regulations.

206. Upon information and belief, Choice controls a uniform and required reservation and marketing system, credit processing system, and training and policy on brand standards, including policies on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections,

37

systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Rodeway Inn and Quality Inn hotel where Plaintiff was trafficked.

207. At all relevant times, Defendants Anna Hotels, Aditi Hospitality and HMM Hansa were involved in the staffing and operation of the Rodeway Inn and Quality Inn hotel where Plaintiff was trafficked for sex. Defendants Anna Hotels, Aditi Hospitality and HMM Hansa managed the hotel pursuant to a franchise agreement with Defendant Choice. Directly and through its franchise agreement with Defendant Choice, Defendant Aakash, and Pace Hotels directly offered public lodging services at the Rodeway Inn and Quality Inn hotel, where Plaintiff was trafficked for sex.

208. As a hotel owner, Defendants Anna Hotels, Aditi Hospitality and HMM Hansa participated in a hotel operating venture that included hotel staff and employees who were closely involved with the daily management and operations of the hotel pursuant to Defendant Choice's brand standards, franchise agreements, licensing agreements, and operating agreements.

209. At all relevant times, Defendant Choice managed, supervised, directed, and/or operated the Rodeway Inn and Quality Inn hotel through its brand standards, franchise agreement, and franchise disclosure documents. Because Choice operated the Rodeway Inn and Quality Inn hotel where Plaintiff was trafficked and was responsible for its management, supervision, and day-to-day operations, the Defendants, jointly knowingly benefited or received something of value from its participation in a venture which it knew or should have known facilitated sex trafficking through the room rentals Plaintiff was victimized in.

210. Defendant Choice and Defendants Anna Hotels, Aditi Hospitality and HMM Hansa participated in a hotel operating venture in connection with the management and operation of the Rodeway Inn and Quality Inn hotel, involving risk and potential profit.

**Wyndham Franchisor and Franchisee Relationship**

211. The Wyndham Defendants are responsible for the acts, omissions, and knowledge of all employees of the Super 8 and Knights Inn named in this suit when operating the hotels because these acts and omissions were committed in the course and scope of

38

employment, because the Wyndham Defendants ratified these acts and omissions, and because the Wyndham Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to the Wyndham Defendants, of sex trafficking occurring at Wyndham branded locations including the subject Super 8 and Knights Inn.

212. Upon information and belief, the Wyndham Defendants participated directly in aspects of the operation of the Subject Super 8 and Knights Inn that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Plaintiff, as follows:

213. The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including the Subject Super 8 and Knights Inn, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

214. The Wyndham Defendants retained control over when its branded hotels, including the Subject Super 8 and Knights Inn, would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels;

215. The Wyndham Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants.

216. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

217. The Wyndham Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

218. The Wyndham Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

219. The Wyndham Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

220. Although they delayed making any reasonable effort to do so, the Wyndham Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

221. The Wyndham Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

222. The Wyndham Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Super 8 and Knights Inn;

223. The Wyndham Defendants maintained control over all details of the terms under which franchised hotels, including the Subject Super 8 and Knights Inn, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject Super 8 and Knights Inn ;

224. The Wyndham Defendants retained control over the setting, supervision, oversight, and enforcement of detailed policies and protocol for housekeeping services at the Subject Super 8 and Knights Inn, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

225.    Wyndham Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject Super 8 and Knights Inn, including trends that would reveal patterns consistent with human trafficking.

226.    The Wyndham Defendants directly participated in and retained day-to-day control over renting rooms at the Subject Super 8 and Knights Inn location by, among other things:

227.    The Wyndham Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

228.    The Wyndham Defendants directly made reservations for rooms at the Subject Super 8 and Knights Inn and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

229.    The Wyndham Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject Super 8 and Knights Inn through detailed policies that it established regarding use of this "do not rent" system;

230.    The Wyndham Defendants controlled room rates, required discounts, mandatory fees, and a rewards program;

231.    The Wyndham Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

232.    The Wyndham Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

233.    The Wyndham Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Super 8 and Knights Inn;

234.    The Wyndham Defendants established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Super 8 and Knights Inn until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests

41

that could be in each room, and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

235.     The Wyndham Defendants required franchisees to use Wyndham's property management system, which was owned, maintained, controlled, and operated by the Wyndham Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

236.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Super 8 and Knights Inn, the Wyndham Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (A.L.H.).

237.     The Wyndham Defendants are vicariously liable for the acts, omissions, and knowledge Franchisee Defendant and the staff at the Subject Super 8 and Knights Inn, which are the Wyndham Defendants' actual agents or subagents.

238.     The Wyndham Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Super 8 and Knights Inn through the franchising agreement, detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants.

239.     The Wyndham Defendants obscure the full extent of control they exercise over Franchisee Defendant by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals.  Upon information and belief, the standards that the Wyndham Defendants imposed on Franchisee Defendant:

   a.  Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Super 8 and Knights Inn ;

   b.  Covered virtually all aspects of hotel operations, including internal operating functions;

42

c. Dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Super 8 and Knights Inn; and

d. Significantly exceeded what was necessary for the Wyndham Defendants to protect their registered trademarks.

240. In addition to the ways described above, upon information and belief, the Wyndham Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Subject Super 8 and Knights Inn, including the following ways:

a. The Wyndham Defendants required Franchisee and management of the Subject Super 8 and Knights Inn to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Defendants to protect their registered trademarks;

b. The Wyndham Defendants provided training for hotel management and select hotel staff on-site at the Subject Super 8 and Knights Inn and at locations selected by the Wyndham Defendants;

c. The Wyndham Defendants required all hotel staff to participate in training they created through an online learning platform they controlled and maintained;

d. The Wyndham Defendants controlled training provided by Franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. The Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that Franchisee was required to purchase to operate the Subject Super 8 and Knights Inn, the Wyndham Defendants designated approved vendors and prohibited Franchisee from purchasing goods and services from anyone other than an approved vendor;

g.  The Wyndham Defendants required Franchisee to sign a technology agreement governing the terms under which Franchisee must procure and use technical services and software while operating the Subject Super 8 and Knights Inn. Franchisee was required to install and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h.  The Wyndham Defendants set required staffing levels for the Subject Super 8 and Knights Inn;

i.  The Wyndham Defendants established detailed job descriptions for all positions at the Subject Super 8 and Knights Inn and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j.  The Wyndham Defendants set requirements for the hiring process used by Franchisee and oversaw employee discipline processes and termination decisions;

k.  The Wyndham Defendants provided benefits for employees of Franchisee;

l.  Wyndham Defendants required Franchisee to use a customer resource management program maintained and operated by the Wyndham Defendants;

m.  The Wyndham Defendants controlled channels for guests to report complaints or Provide feedback regarding the Subject Super 8 and Knights Inn and directly participated in the response and/or supervised the response to customer complaints or other feedback.

n.  The Wyndham Defendants retained the right to provide refunds or other compensation to guests and to require Franchisee to pay associated costs;

o.  The Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the Subject Super 8 and Knights Inn;

p.  The Wyndham Defendants required Franchisee to use a Guest Relations Application owned, operated, and maintained by the Wyndham Defendants to manage all guest data and information. The Wyndham Defendants could use the backend of this system to analyze data and generate reports;

q. The Wyndham Defendants set detailed requirements for insurance that Franchisee must purchase and retained the right to purchase insurance for Franchisee and to bill Franchisee directly for that insurance if the Wyndham Defendants determined that Franchisee has not purchased adequate insurance;

r. The Wyndham Defendants regularly audited the books and records of Franchisee;

s. The Wyndham Defendants conducted frequent and unscheduled inspections of the Subject Super 8 and Knights Inn;

t. The Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if Franchisee violated any of the Wyndham Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Subject Super 8 and Knights Inn;

u. The Wyndham Defendants controlled all marketing for the Subject Super 8 and Knights Inn and prohibited Franchisee from maintaining any online presence unless specifically reviewed and approved by the Wyndham Defendants;

v. The Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operations;

w. The Wyndham Defendants supervised and controlled day-to-day operations of the Subject Super 8 and Knights Inn through detailed information and extensive reports that they obtained through the property management system and other software systems they required Franchisee to use; and

x. The Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

241. Under the TVPRA, Defendants are jointly and severally liable for all damages a jury awards to Jane Doe (A.L.H.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking at the Subject Super 8 and Knights Inn.

45

**G6 Franchisor and Franchisee Relationship**

242.     G6 is a franchisor of the Motel 6 brand, and Defendant Studio 6 Delk Road was its franchisee, with the Motel 6 Marietta being its property.

243.     It is a standard practice in the hospitality industry, followed by Defendants, for Franchisors to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where, and how guests should be greeted.

244.     Franchisors provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

245.     Defendants provide their branded properties branded name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a large extent controlled by the G6 for its Motel 6 locations. Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked

246.     Upon information and belief, G6 require its branded hotel properties to use a property management system, which is linked to its corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

247.     Upon information and belief, per the relevant franchise agreements, G6 may enforce its brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

248.     It is further a standard practice in the hospitality industry, and therefore, upon information and belief, G6 exercises significant control over the employment decisions of their hotel locations, including the Motel 6 Marietta.

46

249. G6 has promulgated policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel location where Plaintiff was trafficked.

250. Under federal labor regulations, G6 and Studio 6 Delk Road are each considered joint employers of the employees at the Motel 6 Marietta.

251. G6 exercised day-to-day control over the Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over the Motel 6 Marietta where Plaintiff was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

252. Upon information and belief, G6 controlled the operations of the Motel 6 Marietta through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

   a. Requiring the Motel 6 Marietta to use G6's centralized property management, data management, and reservation and billing systems;

   b. Gathering reports of data generated by Motel 6 Marietta, including guest information, reservations, payment, and occupancy information through G6's centralized systems;

   c. Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

   d. Requiring Motel 6 Marietta to purchase products through G6's e-procurement marketplace system or from approved suppliers;

   e. Requiring Motel 6 Marietta to pay fees based of the percentage of gross room revenues;

   f. Providing advertising requirements and standardized marketing services;

   g. Requiring the Motel 6 Marietta to use approved vendors for internet services or other requirements for cybersecurity and technology;

   h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

    i.   Regulating employment policies at the Motel 6 Marietta, including training and orientation materials for staff;

    j.   Requiring the Motel 6 Marietta to make modifications upon G6's request and to refrain from making substantial changes without G6's permission;

    k.   Regulating the rates for room rentals; and

    l.   Insurance coverage requirements

253.    G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand-related policies published and communicated via property management systems with back-end management by G6.

254.    G6 controls uniform and required reservation, marketing, customer support systems, and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.

255.    G6 requires the Motel 6 Marietta to use a centralized, cloud-based reservation and property management system.

256.    G6 gathers data from its customers, including names, payment information, reservation history, browsing data, and other details associated with their stay, for promotional and guest safety reasons

257.    G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, which gives G6 the ability to access, monitor, and harvest that internet data.

258.    G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.

259.    G6 participated directly in aspects of the operation of the subject Motel 6 that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Plaintiff as follows:

a. The G6 Defendants have publicly assumed responsibility and control over the human trafficking response of all Motel 6, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

b. The G6 Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded hotels.

c. The G6 Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the G6 Defendants. The G6 Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

d. The G6 Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

e. The G6 Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking.

f. The G6 Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The G6 Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training.

g. Although they delayed making any reasonable effort to do so, the G6 Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity.

h. The G6 Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to

potential criminal incidents at all Motel 6 and Studio 6 properties, including suspected trafficking incidents.

i.  The G6 Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Motel 6.

j.  The G6 Defendants maintained control over all details of the terms under which franchised hotels, including the subject Motel 6, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The G6 Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Motel 6.

k.  The G6 Defendants retained control over the setting, supervision, oversight, and enforcement of detailed policies and protocol for housekeeping services at the Motel 6, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

l.  The G6 Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Motel 6, including trends that would reveal patterns consistent with human trafficking.

260.  G6 played a central role in renting rooms at the subject Motel 6 by, among other things:

a.  The G6 Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

b.  The G6 Defendants directly made reservations for rooms at the Motel 6 and accepted payment for those rooms through a central reservation system that they controlled and operated. The G6 Defendants could reserve rooms and accept payments without requiring Franchisee approval or involvement.

50

c. The G6 Defendants established and maintained control over a brand-wide "do not rent" system. The G6 Defendants set all policies related to the use of this system and dictated the day-to-day details of reservations at the Motel 6 through detailed policies that it established regarding the use of this "do not rent" system.

d. The G6 Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

e. The G6 Defendants controlled and restricted the ability of franchisees and staff to refuse or cancel a reservation.

f. The G6 Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures.

g. The G6 Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Motel 6.

h. The G6 Defendants established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Motel 6. until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room, and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

i. The G6 Defendants required franchisees to use G6's property management system, which was owned, maintained, controlled, and operated by the G6 Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

j. The G6 Defendants oversaw the do-not-rent (DNR) lists for their branded properties.

**FIRST CAUSE OF ACTION: TVPRA**

Trafficking Victims Protection Reauthorization Act ("TVPRA")

18 USC 1595 (against all defendants).

261. The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595, and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter123) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

262. Thus, the federal sex trafficking statute consists of four elements: (a) the defendants(s) knowingly benefited from participation in a venture, (c) the venture violated the TVPRA, and (d) the defendant(s) knew or should have known the venture violated the sex trafficking statute.

**Claim 1: Wyndham and Swan I Hospitality and AAMBA Liability**

**Knowingly Benefited**

263. The Wyndham defendants, Swan I Hospitality and AAMBA, knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

264. The Wyndham defendants, Swan I Hospitality, and AAMBA fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

265. Moreover, the Wyndham defendants were involved in a business venture with Swan I Hospitality and AAMBA Angel Hospitality to operate a hotel and rent rooms.

**The Venture Violated the TVPRA.**

266. The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

267.     Defendants were well aware of the prevalence of sex trafficking generally at their hotels, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Vicarious Liability**

268.     The Wyndham Defendants exercise of day-to-day control over the Wyndham properties in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with respect to ethics and safety, demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisees.

**Claim 2: Red Roof and AAMBA liability**

**Knowingly Benefited**

269.     Red Roof Inn and AAMBA knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

270.     Red Roof Inn and AAMBA fully participated in the commercial venture of renting rooms to plaintiff's traffickers.

271.     Moreover, Red Roof Inn was involved in a business venture with AAMBA to operate a hotel and rent rooms.

**The Venture Violated the TVPRA.**

272.     The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

273.     Defendants were aware of the prevalence of sex trafficking generally at its hotel, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted them to Plaintiff's situation, gave the Defendant constructive knowledge of the sex trafficking of Plaintiff.

**Vicarious Liability**

274.     Defendant Red Roof's exercise of day-to-day control over the Knights Inn in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with respect to ethics and safety, demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisees.

**Claim 3: G6 and Studio 6 Delk Road liability**

**Knowingly Benefited**

275.     G6 and Studio 6 knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

276.     G6 and Studio 6 fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

277.     Moreover, Hilton was involved in a business venture with Studio 6 to operate a hotel and rent rooms.

**The Venture Violated the TVPRA.**

278.     The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

279.     Defendants G6 and Studio 6 were well aware of the prevalence of sex trafficking generally at their hotel, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Vicarious Liability**

280.     G6's exercise of day-to-day control over the Motel 6 property in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with respect to ethics and safety, demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisees.

**Claim 4: Choice, Anna Hotels, Aditi Hospitality, and HMM Hansa Liability**

**Knowingly Benefited**

281.     Choice, Anna Hotels, Aditi Hospitality, and HMM Hansa knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

282.     Choice, Anna Hotels, Aditi Hospitality, and HMM Hansa fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

283.     Moreover, Choice was involved in a business venture with Anna Hotels, Aditi Hospitality, and HMM Hansa to operate a hotel and rent rooms.

**The Venture Violated the TVPRA.**

284.     The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

285.     Defendants Choice, Anna Hotels, Aditi Hospitality, and HMM Hansa were well aware of the prevalence of sex trafficking generally at their hotels, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Vicarious Liability**

286.     Choice's exercise of day-to-day control over the Choice properties in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with respect to ethics and safety,

56

demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisees.

**Claim 5: JayDave, Inc. Liability**

**Knowingly Benefited**

287.    JayDave, Inc. knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

288.    JayDave, Inc. participated in the commercial venture of renting rooms to Plaintiff's traffickers.

**The Venture Violated the TVPRA.**

289.    The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

290.    Defendant JayDave was well aware of the prevalence of sex trafficking generally at budget inns, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**SECOND CAUSE OF ACTION: CAVRA**

Child Abuse Victims Rights Act ("CAVRA")

18 USC 2255 (against all defendants)

291.     Federal law provides civil remedies for victims of child exploitation by way of a statute commonly referred to as "Masha's Law." The statute provides a cause of action for minors who were victims of a violation of enumerated federal laws, including 18 U.S.C. § 1591.

292.     Defendants knowingly benefited from harboring Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels that they own, operate, and oversee, under the circumstances where they knew that Plaintiff, a minor, would be engaged in commercial sex acts.

293.     Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## THIRD CAUSE OF ACTION: NEGLIGENCE

(against all defendants)

294.     These defendants have a heightened duty of care to invitees, such as Plaintiff, who stay at their hotels.

295.     As alleged above, sex trafficking was a reasonably foreseeable occurrence at the defendants' hotels from their knowledge and past experiences that persons on the premises would suffer serious bodily harm as a result of being victimized by crimes perpetrated by third parties on the premises and that they should have known for more than a decade that sex trafficking runs rampant at their motels.

296.     Additionally, the franchisors are vicariously liable for the negligence of its agents and franchisees.

## PRAYER FOR RELIEF

Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-

judgment interest, attorneys' fees, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

**JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

By: /s/ *Penny L. Barrick*
Penny L. Barrick, (0074110)
Steven C. Babin, Jr. (0093584)
**Babin Law, LLC**
10 W Broad Street
Suite 900
Columbus, Ohio 43215
Phone: 614.761.8800
Direct: 614.372.6404
Cell: 614.747.6184
Fax: 614.706.1775
penny.barrick@babinlaws.com
steven.babin@babinlaws.com
*Counsel for Plaintiff*